UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

LANDAMERICA FINANCIAL GROUP, INC.,

Appellant,

v.

SOUTHERN CALIFORNIA EDISON CO.,

Appellee.

Civil Action No. 3:14-CV-762

## MEMORANDUM OPINION

THIS MATTER is before the Court on appeal from the United States Bankruptcy Court for the Eastern District of Virginia, *In re LandAmerica Financial Group, Inc.*, No. 08-35994-KRH, 2014 WL 2069651 (Bankr. E.D. Va. 2014) (Huennekens, K.R.), pursuant to 28 U.S.C. § 158(a)(1). Appellant filed its notice of appeal on September 23, 2014 and subsequently filed its brief in support of appeal on November 21, 2014 ("App. Br.") (ECF No. 5). Appellee filed its brief in opposition ("Opp'n Br.") (ECF No. 7) on December 5, 2014, and Appellant then filed its reply on December 19, 2014 ("Reply Br.") (ECF No. 8). The Court dispenses with oral argument because the facts and legal contentions are adequately presented in the materials before the Court, and oral argument would not aid the decisional process. E.D. Va. Loc. Civ. R. 7(J); Fed. R. Bankr. P. 8012. For the reasons set forth below, the Court AFFIRMS the Bankruptcy Court's decision and DISMISSES this Appeal.

//

//

//

//

1

## I.   **BACKGROUND[1]**

This appeal arises from the Bankruptcy Court's decision granting partial summary judgment in favor of Southern California Edison, Company ("SCE") and denying the motion for summary judgment filed by LandAmerica Financial Group, Inc. ("LFG").

LFG was a holding company that operated a title insurance business and other real estate transaction services. LFG conducted all of its operations through its operating subsidiaries, which included LandAmerica OneStop, Inc. ("OneStop") and Southland Title Corporation ("Southland"). [LFG and all of its operating subsidiaries will hereinafter be referred to collectively as "LandAmerica".] LFG's ability to meet its current and future obligations was dependent upon its ability to generate positive cash flow from its operating subsidiaries.

Southland was an underwritten title company, which provided title, escrow and other real estate-related products and services to residential and commercial buyers and sellers, real estate agents and brokers, developers, attorneys, and mortgage brokers and lenders primarily located in Southern California. OneStop was part of LFG's lender services business segment and provided a full range of integrated residential real estate services, such as the coordination and delivery of title insurance, settlement/closing and escrow services, appraisal and valuation services, property inspections, real estate tax processing services, and default and foreclosure services.

LFG operated and administered a centralized cash management system (the "CCMS") on behalf of LandAmerica. The CCMS was designed to collect, transfer and disburse funds generated by LandAmerica and to allocate and record each such deposit, transfer, and disbursement by a cost center code that corresponded to a specific legal entity. Under the CCMS, subsidiaries would contribute their revenues to centralized cash accounts, and LFG, as the party managing the disbursement of funds from those accounts to the vendors and other creditors of

[1] The parties filed a Joint Stipulation of Fact ("Stipulation of Facts") on March 26, 2014, which served as the basis for their respective motions for summary judgment in the Bankruptcy Court. The parties' Stipulation is included at Docket Entry 1-1, or "USBC Designation 1," beginning at page 35 of the PDF document.

various subsidiaries, would pay out funds from the accounts to such parties. There was no readily apparent cycle or periodic nature of cash transfers made to LFG on behalf of its subsidiaries; rather, cash transfers were made to LFG when cash was available at the subsidiary level. Approximately ninety percent of LandAmerica revenue flowed through the CCMS.

LFG maintained approximately thirty-one active bank accounts which were linked to the CCMS. Three LFG concentration accounts served as the nerve center for the CCMS (the "Concentration Accounts") and were funded daily with wire transfers and sweeps from approximately sixteen depository accounts held by LFG and its subsidiaries. For disbursements, LFG used funds in the Concentration Accounts to fund approximately nine separate disbursement accounts (the "Disbursement Accounts"), out of which LFG cut checks to pay for LFG's obligations and to pay for obligations on behalf of its subsidiaries. The use of the CCMS was recorded and reflected in LFG's accounting system through an account entitled "Accounts with Affiliates."

From February 1, 2008 through November 26, 2008 (the "Petition Date"), through operation of the CCMS, OneStop and Southland provided substantially all of their earned cash revenues to LFG, and thus neither subsidiary had sufficient funds to pay their own expenses. Instead, LFG in turn paid substantially all of those subsidiaries' cash expenses. During that time period, LFG received over $30 million more in revenues generated by OneStop than LFG disbursed on behalf of OneStop.[2] LFG also received over $11 million more in revenues generated by Southland than LFG disbursed on behalf of Southland.[3] Thus, LFG received positive net cash flow from the operations of its OneStop and Southland subsidiaries during this time period in the aggregate amount of roughly $40 million.

---

[2] Specifically, from February 1, 2008 through the Petition Date, LFG received total cash transfers of $289,488,203 and disbursed total cash transfers of $259,037,818 on behalf of OneStop through operation of the CCMS.

[3] Specifically, LFG received total cash transfers of $47,269,366 and disbursed total cash transfers of $35,950,092 on behalf of Southland through the operation of the CCMS.

From February 2008 through the Petition Date, both OneStop and Southland required electricity for lighting their office buildings, heating and air conditioning their office buildings, and powering computers and other technology. From February 1, 2008 through the Petition Date, SCE provided that electric utility service at various locations within California. Through the operation of the CCMS, LFG made payments to SCE for OneStop's and Southland's electrical utlity expenses, totaling $206,394.49 and $39,479.14, respectively.

Beginning in 2007 and continuing through 2008, there were significant declines in mortgage financing, property values, and the number of real estate transactions, which when combined significantly and adversely affected LandAmerica's primary business activities and liquidity. LandAmerica's revenues were reduced by over forty percent from the fourth quarter of 2006 to the third quarter of 2008.

On the Petition Date, LFG filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Bankruptcy Court"). After the Petition Date, LFG continued to manage its properties and operations as debtors in possession pursuant to 11 U.S.C. §§ 1107 and 1108. Subsequently, several other LandAmerica entities, including Southland and OneStop, filed for bankruptcy protection, and each of those cases was jointly administered for procedural purposes with LFG's bankruptcy case. The debtors then filed a Joint Chapter 11 Plan (the "Plan"), which created separate liquidating trusts for LFG and for each of the other LFG affiliated Debtors. The Plaintiff in this adversary proceeding was created to oversee the liquidation and distribution of the LFG assets.

On November 24, 2010, the Plaintiff filed its Complaint against SCE seeking to avoid and recover transfers pursuant to 11 U.S.C. §§ 544, 547, 548 and 550 and to disallow claim(s) pursuant to 11 U.S.C. § 502(d). The Complaint sought the avoidance and recovery of certain

transfers, in the aggregate amount of $263,462.69 (the "Transfers")[4], made by LFG to SCE during the nine-month period from February 27, 2008 through the Petition Date (the "Avoidance Period"). In Count I of the Complaint, Plaintiff sought to avoid the Transfers pursuant to 11 U.S.C. § 548(a)(1)(B) as constructively fraudulent conveyances, alleging that LFG did not receive reasonably equivalent value. In Count II of the Complaint, Plaintiff sought to avoid the Transfers under 11 U.S.C. § 544(b)(1) and Virginia Code § 55-81, alleging that the transfers were not made in exchange for valuable consideration.

On March 31, 2014, Plaintiff and SCE each filed motions for partial summary judgment. The Bankruptcy Court conducted a hearing on the parties' respective motions on May 1, 2014. At the conclusion of the hearing, the Bankruptcy Court announced its decision to grant SCE's motion for partial summary judgment, and deny LFG's motion for partial summary judgment. The Bankruptcy Court's order was entered on May 19, 2014.[5] LFG then filed a Motion to Alter or Amend Order on June 2, 2014, which the Court subsequently denied on September 9, 2014. The notice of appeal was then filed on September 23, 2014, within the time provided by Federal Rule of Bankruptcy 8002(a) and (b).[6]

## II.   LEGAL STANDARD

Appeals from bankruptcy courts are governed by 28 U.S.C. § 158, which states that the district courts have jurisdiction to hear appeals "from final judgments, orders, and decrees" and "with leave of the court, from other interlocutory orders and decrees."  28 U.S.C. § 158(a)(1)–(2). A district court "may affirm, modify or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." Fed. R. Bankr. P. 8013. In reviewing a

---

[4] Since the filing of the Complaint, Plaintiff determined that $26,170.33 of the Transfers were made by LFG on behalf of subsidiaries that were solvent at the time the transfers were made, thus leaving a total of $237,292.36 in transfers that Plaintiff sought to avoid as constructively fraudulent transfers.

[5] This was a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F) and (O).

[6] Bankruptcy Rule 8002 provides that a "notice of appeal shall be filed with the clerk within 14 days of the date of the entry of the judgment, order, or decree appealed from." Fed. R. Bankr. P. 8002(a). However, if the party makes a timely motion "to alter or amend the judgment under Rule 9023," then "the time for appeal for all parties runs from the entry of the order disposing of the last such motion outstanding." Fed. R. Bankr. P. 8002(b)(2).

bankruptcy court's judgment, the district court reviews legal conclusions de novo and findings of facts for clear error. *Tidewater Fin. Co. v. Williams*, 498 F.3d 249, 254 (4th Cir. 2007). A finding of fact is clearly erroneous if a court reviewing it, considering all of the evidence, "is left with the definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985); *accord Educ. Credit Mgmt. Corp. v. Mosko (In re Mosko)*, 515 F.3d 319, 324 (4th Cir. 2008). Specifically with regards to motions for summary judgment, a district court reviews the bankruptcy court's decision de novo. *Smith v. Ruby (In re Public Access Technology.com, Inc.)*, 307 B.R. 500, 504 (E.D. Va. 2004) (citing *Hager v. Gibson*, 109 F.3d 201, 207 (4th Cir. 1997)).

## III.   DISCUSSION

Appellant presents four issues on appeal: (1) whether the Bankruptcy Court erred in determining that LFG received reasonably equivalent value in exchange for its transfers to SCE by LFG's receipt through the operation of its centralized cash management system of funds generated by its subsidiaries; (2) whether the Bankruptcy Court erred in determining that a contractual relationship existed between LFG and its subsidiaries which obligated LFG to pay the subsidiaries' vendors through the operation of its centralized cash management system; (3) whether the Bankruptcy court erred in finding that, to the extent that a contractual obligation existed between LFG and its subsidiaries, the satisfaction of that contractual obligation constituted reasonably equivalent value provided to LFG in exchange for the transfers to SCE; and (4) whether the Bankruptcy Court erred in failing to identify the measure of the value LFG received as a result of satisfying obligations the Court found it owed to its subsidiaries through the operation of its centralized cash management system.

### (1) Claim 1: LFG Did Not Receive Reasonably Equivalent Value in Exchange for the Transfers

Bankruptcy Code section 548 provides in part,

The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within

2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily . . . received less than a reasonably equivalent value in exchange for such transfer or obligation.

11 U.S.C. § 548(a)(1)(B)(i). Value is defined as "property, or satisfaction or securing of a present or antecedent debt of the debtor." 11 U.S.C. § 548(d)(2)(A). As an initial matter, Appellant contends that the Bankruptcy Court erred by looking beyond the plain language of section 548 and resorting to case-made law regarding the "indirect benefit rule." Appellant argues that the plain language of section 548 confirms that LFG's transfers to SCE were constructively fraudulent because they were made without any consideration in return. However, the statute does not address who must provide the reasonably equivalent value to the debtor. In other words, the statute does not indicate whether or not the value must be provided directly by the transferee or indirectly from a third party. Therefore, the Bankruptcy Court properly resorted to case-made law to resolve the issues presented.

Accordingly, relying on case law, the Court must next analyze the so-called "indirect benefit rule" applicable in this case. The Second Circuit recognized that "[t]hree-sided transactions . . . present special difficulties" in determining whether the debtor received "fair consideration" for the transfer. *Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 991 (2d Cir. 1981). However, "[i]t is well settled that reasonably equivalent value can come from one other than the recipient of the payments, a rule which has become known as the indirect benefit rule." *Harman v. First. Am. Bank of Md. (In re Jeffrey Bigelow Design Group, Inc.)*, 956 F.2d 479, 485 (4th Cir. 1992); *see also Rubin*, 661 F.2d at 991 (quoting *Klein v. Tabatchnick*, 610 F.2d 1043, 1047 (2d Cir. 1979)) ("[T]he transaction's benefit to the debtor 'need not be direct; it may come indirectly through benefit to a third person.'"); *Gold v. U.S. (In re Kenrob Info. Tech. Solutions)*, 474 B.R. 799, 802 (Bankr. E.D. Va. 2012) ("Consideration need not come directly from the party to whom the payment is made" but instead "[c]onsideration may be derived from a third party."). Thus, rather than focusing on the allegedly complicated "tri-partite relationship" and "transfer path" as Appellant urges us to do (App. Br. at 13–14), the Court

7

instead focuses "on the consideration received by the debtor, not on the value given by the transferee." *In re Jeffrey Bigelow Design Group, Inc.*, 956 F.2d at 484 (citation omitted).

The purpose of section 548 is "to preserve the debtor's estate for the benefit of its unsecured creditors." *Ruby v. Ryan (In re Ryan)*, 472 B.R. 714, 724–25 (Bankr. E.D. Va. 2012) (citations omitted). Thus, so long as "the value of the benefit received by the debtor approximates the value of the property or obligation he has given up," the transfer was not fraudulent. *Rubin*, 661 F.2d at 991–92. In other words, the proper "focus is whether the net effect of the transaction has depleted the bankruptcy estate." *In re Jeffrey Bigelow Design Group, Inc.*, 956 F.2d at 485; *see also Rubin*, 661 F.2d at 992 ("[A]lthough these 'indirect benefit' cases frequently speak as though an 'identity of (economic) interest' between the debtor and the third person sufficed to establish fair consideration . . ., the decisions in fact turn on the statutory purpose of conserving the debtor's estate for the benefit of creditors.").

In this case, although LFG commingled the funds it received from various subsidiaries, there is no dispute that LFG received over $30 million more in funds from OneStop and over $11 more in funds from Southland than it disbursed on their behalf during the relevant time period. (Stipulation of Facts ¶¶ 75–76; 80–81.) Therefore, "the unsecured creditors are no worse off because [LFG], and consequently the estate, has received an amount reasonably equivalent to [or even more than] what it paid" to SCE. *In re Jeffrey Bigelow Design Group, Inc.*, 956 F.2d at 484.

Next, Appellant contends that the Bankruptcy Court erred by failing to recognize the "in exchange for" element of section 548. As Appellant notes, a transfer is "in exchange for" value if one is the quid pro quo of the other. *Kaler v. Able Debt Settlement (In re Kendall)*, 440 B.R. 526, 532 (B.A.P. 8th Cir. 2010). Appellant argues that LFG would have enjoyed the positive cash flows from its subsidiaries regardless of the transfers to SCE, and thus no bargained-for quid pro quo exists. *See In re TOUSA, Inc.*, 422 B.R. at 868 ("Any 'property' that a [debtor] would have enjoyed regardless of [the transfer in question] cannot be regarded as property received 'in

exchange for' the transfer or obligation."). However, the Court finds Appellant's argument unavailing.

As SCE notes, Appellant's argument is purely hypothetical as no evidence exists to support the theory that OneStop and Southland would have continued to upstream their revenues had LFG ceased paying their vendors' invoices. Instead, the parties' stipulation states that LFG had in fact "paid substantially all of OneStop's and Southland's operating expenses ever since those subsidiaries had begun participating in the CCMS, including the period from February 1, 2008 to the Petition Date." (Stipulation of Facts ¶ 42.) As this Court has noted, the mere prospect of hypothetical alternatives, without any supporting documentation, fails to create a genuine issue as to a material fact. *In re Kenrob Info. Tech. Solutions, Inc.* 474 B.R. at 803.

Next, Appellant alleges that the Bankruptcy Court erred by relying on the net cash flow at the conclusion of the Avoidance Period, as such analysis ignores the "contemporaneity" element described by the United States Bankruptcy Court of the Eastern District of California in *Greenspan v. Orrick, Herrington & Sutcliffe LLP (In re Brobeck, Phleger & Harrison LLP)*, 408 B.R. 318 (Bankr. N.D. Cal. 2009) ("Items of value coming to the debtor after the transfer must be excluded as any part of consideration, at least when it was not bargained for at the date of the original transaction."). Appellant moreover argues that the Bankruptcy Court's analysis ignored the possibility that "cash flowing through the CCMS may have been far less positive, or in fact negative, at various points at the time LFG made the individual Transfers throughout the Avoidance Period." (App. Br. at 21.)

However, this Court has previously stated that "[t]here is no requirement that the consideration be contemporaneous." *In re Kenrob Info. Tech. Solutions, Inc.* 474 B.R. at 803. The debtor in *Kenrob* was a chapter S corporation that by its nature did not pay taxes itself but passed through the tax liability to its shareholders. *Id.* at 801. Defendants were the shareholders who paid the taxes as part of their personal income tax return. *Id.* By agreement, the debtor was

9

obligated to reimburse the shareholders for the additional incomes taxes attributable to the pass-through liability from the corporation. *Id.* The debtor paid the personal income taxes attributable to the pass-through liability directly to the Internal Revenue Service ("IRS"). *Id.* The tax payments were applied to the shareholder's personal tax returns. *Id.* The Plaintiff trustee of the bankrupt debtor alleged that these transactions were fraudulent because they were made without consideration by the corporation. The Court ultimately granted the defendant's summary judgment motion, and in doing so rejected the trustee's argument that the shareholders' agreement made years before the transaction was not sufficient consideration. The Court stated,

> The consideration was the election by the shareholders of the corporation to be taxed as a chapter S corporation as long as the corporation paid their additional personal taxes. There was a continuing benefit to the corporation over the years and a continuing obligation on the part of the corporation to reimburse the shareholders.

*Id.* at 803. Similarly, in this case, LFG had a continuing obligation to pay OneStop's and Southland's vendors' invoices through the CCMS in exchange for the continuing benefit of those subsidiaries upstreaming their revenues to LFG.

With regard to Appellant's latter argument that the Bankruptcy Court erred by only focusing on the net result, case law clearly rejects Appellant's argument and instead supports the Bankruptcy Court's analysis. The Fourth Circuit has stated that the proper focus in determining reasonably equivalent value "is whether the *net effect* of the transaction has depleted the bankruptcy estate. *In re Jeffrey Bigelow Design Group, Inc.*, 956 F.2d at 485 (emphasis added). In determining "reasonably equivalent value," it is therefore unnecessary to "demand a precise dollar-for-dollar exchange" as Appellant urges this Court to do. *Bakst v. U.S. (In re Kane & Kane)*, 479 B.R. 617, 628 (Bankr. S.D. Fla. 2012); (App. Br. at 20) ("There is no way to say that as LFG made each of the distinct transfers to SCE to pay one of SCE's invoices issued to OneStop or Southland, LFG received reasonably equivalent value in exchange for any such payment."). The stipulated facts plainly state that LFG received positive net cash flow from the operations of

its OneStop and Southland subsidiaries from February 1, 2008 through the Petition Date in the aggregate amount of roughly $40 million. More specifically, the evidence shows on a monthly basis, LFG received more cash than it disbursed on OneStop's behalf in April, May, August, September and October 2008.[7] (Stipulation of Facts ¶ 77.) Additionally, on a monthly basis, LFG received more cash than it disbursed on Southland's behalf in each month between February 2008 and the Petition Date, except March and May.[8] (*Id.* at ¶ 81.)

Thus, in sum the Court finds Appellant's Claim 1 without merit.

**(2) Claim 2: There Was No Contractual Relationship that Obligated LFG to Pay the Invoices Provided to Its Subsidiaries By Their Vendors Through the CCMS**

The Bankruptcy Court concluded that "LFG not only had a contractual duty, but also a fiduciary obligation to make disbursements on behalf of its subsidiaries." *In re LandAmerica Financial Group, Inc.*, 2014 WL 2069651, at *9–10. Appellant, however, argues that this "attractive conclusion" is not supported by the record. But, again, the Court finds Appellant's argument unpersuasive.

"Agency is a fiduciary relationship between two parties in which one party agrees to act on behalf of and subject to the control of the other party." *Banks v. Mario Indus. of Va., Inc.* 650 S.E.2d 687, 695 (Va. 2007). "[A]gency may be inferred from the conduct of the parties and from the surrounding facts and circumstances." *Accordia of Va. Ins. Agency, Inc. v. Genito Glenn, L.P.,* 560 S.E.2d 246, 250 (Va. 2002) (quoting *Drake v. Livesay*, 341 S.E.2d 186, 189 (1986)). In the Stipulation of Facts, the parties jointly admit that LFG acted as a "disbursement *agent*" for its subsidiaries in accordance with the CCMS. (Stipulation of Facts ¶¶ 56, 57.) But besides this express stipulation, the agency relationship between LFG and OneStop and Southland is also supported by the fact that before LFG made the Transfers to SCE, the subsidiaries had to

---

[7] As to the remaining months during the Avoidance Period, LFG received cash on OneStop's behalf equal to the following percentages of the cash it disbursed on OneStop's behalf: February–75%; March–73%; June–73%; July–94%; and November–97%. (Stipulation of Facts ¶ 77.)

[8] In March and May, LFG received cash on Southland's behalf equal to 24% (in March) and 95% (in May) of the cash it disbursed on Southland's behalf during those months. (Stipulation of Facts ¶ 81.)

approve the corresponding invoices for payment through the CCMS. (Stipulation of Facts ¶¶ 69, 70.) If, as Appellant hypothesizes, LFG had decided to protect its own creditors, and retain all of the cash flow that was provided to it through CCMS to pay its own bills, (App. Br. at 24–25), the subsidiaries would definitely have had an action for breach of fiduciary duties by virtue of this agency relationship.

Moreover, besides the obvious agency relationship, the Bankruptcy Court also concluded that an implied contractual relationship existed between LFG and OneStop and Southland. While the parties agree that there was no direct contract, written or oral, which obligated LFG to pay for charges incurred on the OneStop or Southland accounts, (Stipulation of Facts ¶¶ 45, 71), the Bankruptcy Court properly concluded that a contract implied in fact existed.

"A contract implied in fact is 'a true contract containing all necessary elements for a binding agreement except that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the circumstances.'" *In re Fas Mart Convenience Stores, Inc.*, 320 B.R. 587, 595 (Bankr. E.D. Va. 2004) (citation omitted). In analyzing whether such a contract exists, the Court must analyze the parties' intent to contract. *Id.*

> First, as an initial matter, the parties stipulated that
>
> Based on the accounting records of LFG, OneStop, and Southland, it is evident that OneStop and Southland in fact participated in the CCMS from February 2008 through the Petition Date, and before that time period, and that there must have been oral and/or implied agreements, at least on a basic level, between LFG and both OneStop and Southland relating to their participation in the CCMS.

(Stipulation of Facts ¶ 46.) Moreover, through the parties' conduct their intent to contract is clearly visible. OneStop and Southland upstreamed substantially all of their earned revenues to the CCMS with the clear expectation that LFG would pay their operating expenses through the CCMS, which the CCMS was designed to do. (*Id.* at ¶¶ 27, 38). And LFG did in fact pay substantially all of its subsidiaries' cash expenses. (*Id.* at ¶ 38.) By providing LFG with all of their earned cash revenues, neither OneStop nor Southland had sufficient funds to pay their

12

own expenses from February 1, 2008 to the Petition Date. (*Id.* at ¶ 39.) The Stipulation of Facts even admits that the parties had an "understanding and expectation that LFG would, in turn, pay OneStop's and Southland's operating expenses through the CCMS accounts." (*Id.* at ¶ 41.)

With the foregoing in mind, it is difficult to even logically perceive Appellant's argument that no contractual relationship existed among the parties because such a clear implied in fact contract was present. If LFG had breached that contract, the subsidiaries would have undoubtedly had a cause of action against LFG.

> **(3) <u>Claim 3: Even If a Contractual Relationship Existed Between LFG and Its Subsidiaries Obligating LFG to Pay the Invoices Provided to Its Subsidiaries by Their Vendors, the Satisfaction of That Obligation by LFG Did Not Generate Reasonably Equivalent Value Received by LFG in Exchange for the Transfers to SCE for Purposes of Bankruptcy Code § 548</u>**

Appellant agrees that the concept that "[s]atisfaction of a valid obligation constitutes reasonably equivalent value"[9] is, by itself, sound. (App. Br. at 26.) However, Appellant argues that the two cases[10] relied on by the Bankruptcy Court fail to address the three-party relationship present in this case. Appellant contends that neither case supports the "Bankruptcy Court's underlying conclusion that LFG's satisfaction of some obligation it owed to OneStop and Southland in paying their vendors' invoices through the operation of the CCMS resulted in reasonably equivalent value received by LFG in exchange for transferring over $237,000 to SCE." (App. Br. at 26.)

As noted above, "value" for purposes of section 548 is defined as "property, or satisfaction or securing of a present or antecedent debt *of the debtor*." 11 U.S.C. § 548(d)(2)(A) (emphasis). The plain language of the statute provides only that the debt satisfied by a transfer must be owed by the debtor. It is silent regarding to whom the debtor must owe that debt. Thus, Appellant's argument revolving around the fact that LFG did not specifically have any obligation

---

[9] *Schoenmann v. BCCI Constr. Co. (In re NorthPoint Commc'ns Group, Inc.)*, 361 B.R. 149, 161 (Bankr. N.D. Cal. 2007).
[10] *Crumpton v. Stephens (In re Northlake Foods, Inc.)*, 715 F.3d 1251, 1256 (11th Cir. 2013) and *Schoenmann*, 361 B.R. 149.

to SCE is irrelevant. Instead, the focus should be on the fact that LFG owed an obligation to OneStop and Southland and by paying their vendors' invoices through the CCMS, LFG satisfied that obligation.

This argument also relates back to the prior discussion regarding the purpose of section 548, which is "to preserve the debtor's estate for the benefit of its unsecured creditors." *In re Ryan*, 472 B.R. at 724–25. "Where an economic benefit is present, 'the debtor's net worth has been preserved, and the interest of the creditors will not have been injured by the transfer.'" *In re Northlake Foods, Inc.*, 715 F.3d at 1256 (citation omitted). As previously explained, LFG received an economic benefit through the upstreaming of substantially all of OneStop's and Southland's cash revenues. LFG then owed a fiduciary and contractual obligation to pay OneStop's and Southland's vendors' invoices. LFG's net worth was preserved through these transactions as it received total funds from both OneStop and Southland in amounts greater than total funds disbursed by LFG on behalf of those subsidiaries. (Stipulation of Facts ¶¶ 75–76; 80–81.) In sum, as succinctly stated by SCE, "So long as a debt owing by the debtor is removed from the debtor's books as a result of the transfer, the creditors are no worse off and would have no basis for complaint." (Opp'n Br. at 18.)

### (4) **Claim 4: The Bankruptcy Court's Decision Erred in Failing to Describe Any Quantifiable Value At All From LFG's Satisfaction of Obligations Owed to OneStop and Southland**

"Whether reasonably equivalent value was received by the debtor on the date of transfer is a two-step analysis: (1) did the debtor receive value, and (2) was the payment reasonably equivalent to the value extended?" *Cohen v. Un-Ltd. Holdings, Inc. (In re Nelco, Ltd.)*, 264 B.R. 790, 813 (Bankr. E.D. Va. 1999); *see also Whitney v. Newman (In re Whitney)*, No. 06-14435-TJC, 2007 WL 2230063, at *5 (Bankr. D. Md. July 30, 2007) (citing *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 546 (1994)) ("In order to determine whether the debtor received reasonably equivalent value for the transfer, the Court must compare the value of the consideration received by the debtor with the value of the property transferred by the debtor."). The measure

of "reasonably equivalent value" is a factual issue dependent on the circumstances of the transfer that must be determined on a case-by-case basis. *Official Comm. of Unsecured Creditors v. Wachovia (In re Heilig-Meyers Co.)*, 279 B.R. 46, 52 (Bankr. E.D. Va. 2003).

Appellant argues that the Bankruptcy Court "failed to identify the measure of such value [received by LFG] in *any* way." (App. Br. at 27.) In other words, Appellant contends that there were no facts in the record to "identify whether the value to LFG by satisfying the obligations amounted to $1, $100,000 or $237,292.36." (*Id.*) Thus, Appellant argues that the Bankruptcy Court erred in concluding that the value received was "reasonably equivalent" to the amount that LFG transferred to SCE.

Contrary to Appellant's argument, the Bankruptcy Court had adequate facts to determine that the value received by LFG was reasonably equivalent to the transfers it made to SCE on behalf of OneStop and Southland. As stated above, there is no dispute that LFG received over $30 million more in funds from OneStop and over $11 more in funds from Southland than it disbursed on their behalf during the relevant time period. (Stipulation of Facts ¶¶ 75–76; 80–81.) Specifically, from February 1, 2008 through the Petition Date, LFG received total cash transfers of $289,488,203 and disbursed total cash transfers of $259,037,818 on behalf of OneStop, and received total cash transfers of $47,269,366 and disbursed total cash transfers of $35,950,092 on behalf of Southland. (*Id.* at ¶¶ 75, 80). Therefore because the net effect of these transfers to SCE did not deplete LFG's estate, the Bankruptcy Court properly concluded that LFG received reasonably equivalent value. *See In re Jeffrey Bigelow Design Group, Inc.*, 956 F.2d at 485.

## IV.     **CONCLUSION**

For the foregoing reasons, the Court AFFIRMS the Bankruptcy Court's opinion in all respects and DISMISSES this Appeal.

//

//

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

An appropriate Order shall issue.

_____/s/_____
James R. Spencer
Senior U. S. District Judge

ENTERED this ___16th___ day of January 2015.